ROBERT PARMALEE V. STATE OF NEBRASKA.

FILED APRIL 1, 1916. No. 18986.

Rape: SUFFICIENCY OF EVIDENCE. Evidence examined, its substance set out in the opinion, and *held* sufficient to sustain the verdict of the jury.

ERROR to the district court for Lincoln county: HANSON M. GRIMES, JUDGE. *Affirmed.*

*Reese, Reese & Stout* and *E. H. Evans,* for plaintiff in error.

*Willis E. Reed, Attorney General,* and *Charles S. Roe, contra.*

MORRISSEY, C. J.

This is an error proceeding from the district court for Lincoln county, where defendant, Robert Parmalee, was convicted of the crime of rape on the person of Minnie Thiede, a female child under the age of 18 years, and over the age of 15 years, with her consent. The crime is alleged to have been committed April 10, 1914. A number of assignments of error are set out in the brief, but the principal complaint is that the evidence is insufficient to sustain the verdict.

The defendant was 26 years of age at the time of the acts complained of, and had been employed as foreman or manager of a ranch. Prosecutrix had been living at this ranch,

assisting with the housework and attending school.  About the 1st of April, defendant left the Hansen ranch and went to another farm, or ranch, located a mile therefrom, where it would appear he was to engage in business for himself. April 10 defendant and prosecutrix were present at a party at a nearby farm.  They were among the last to leave.  According to defendant's theory, he did not regard himself as her escort and did not get her horse for her; but, when he had saddled his horse and made ready to leave the premises, he found her already mounted and ready to join him. He admits they rode together for some distance, until they reached a turn in the road which would take him to his home, but says that he there left her to proceed to the Hansen ranch alone.

She testifies that he accompanied her to the Hansen ranch; that on the way he suggested that they have sexual intercourse, and she refused; that on arriving at the ranch they went into the barn; he turned his horse loose, and she proceeded to unsaddle her horse; that he took hold of her and coaxed her to have sexual intercourse with him, and that she finally consented and the first act of intercourse between them took place; that he returned to the Hansen ranch from time to time thereafter until the 20th of the month, and that during this time she had intercourse with him once in the barn and three times in the house.  She remained at the Hansen ranch until the 28th of April, when, after arriving at the schoolhouse, she became sick with an attack of vomiting.  That she went from the schoolhouse to a neighbor's, and from there she was taken to a hospital in North Platte by her mother and sister; that the doctor made an examination of her and found her pregnant.  The child was not born at the time of the trial, but her pregnancy seems to be admitted.  She testifies that he was the only man with whom she had ever had intercourse.

It is not clear whether the Hansens were at home at the time of the alleged intercourse on April 10, or whether they had not yet returned from North Platte, where they had spent the evening.  On the other occasions of which she

Parmalee v. State.

testifies, she says that he came to the place evenings, after she had returned from school, and when Mr. and Mrs. Hansen were away from home. The testimony shows that the Hansens kept an automobile, and were away from home a good deal during that period. Mr. Hansen was called as a witness for the defendant, and testified that he did not see defendant at the ranch on any of the occasions mentioned by the prosecutrix, but his testimony is of a merely negative character and does not show that her testimony in that regard is untrue.

In May following she called on defendant where he was cultivating corn and charged him with being responsible for her condition. Their version of the conversation differs somewhat. She says that he said: "He would never marry me. He said that if he had to marry me he would treat me like a rattlesnake. He said a man could treat a woman in such a miserable life that she will take her own life, and he said he did not want me to say anything to mamma about this business; and he said for me to come in and he was going to send me to Broken Bow, Nebraska, and have this child knocked, and he told me to be in at 9 o'clock in the evening on the south side of the bandstand in the courtyard."

He admits that she called on him and told him she was in trouble, and says that he asked her why she called on him, and she replied that she thought he might help her, and that he asked, " 'Why don't you go to Charlie Russell.' I says, 'Wasn't he caught in the room with you?' And she says, 'Well, yes; but he never did anything.' I says, 'Well, why don't you marry him?' She says, 'I don't want to.'" That she then asked him if he would help her, and he replied, "Well, I will consider this proposition over. * * * I told her then a certain length of time to meet me down here by the courthouse and I would tell her what I had considered. I wanted to counsel somebody whether it was right for me to help her or not. And that was the end of our conversation."

Subsequent to this a bastardy proceeding was instituted, and the prosecutrix, her mother and sister went to the county attorney's office, and the county attorney and defendant met, and the county attorney sent defendant to his office, with the suggestion that a settlement be effected. The three women testify that in that conversation defendant admitted that he was responsible for her condition, and offered to pay $200 in settlement if they would keep the matter out of court; that no settlement was made, and a few days thereafter defendant approached them on the streets of North Platte and again made an offer of settlement; that the girl's mother demanded that a marriage ceremony be performed; that defendant declined; that he held up his hands and said, "Fight it. * * * Pen for me." He admits making an effort to effect a settlement, but he says that this was done owing to the suggestion of the county attorney and his desire to protect his name and keep out of court.

At the hearing in the bastardy proceeding, the prosecutrix testified that the first act of intercourse was had in the afternoon of April 14 in the barn, and she made no mention whatever of what she now alleges occurred some days before on the return from the party heretofore mentioned. Counsel for defense lay much stress upon this feature of her testimony, which she admitted upon this trial to be untrue. It is, of course, a circumstance to be taken into consideration in weighing her testimony. But it must be remembered that she was a young girl, inexperienced in court procedure, in a delicate state of health, and probably testifying for the first time; and prompted somewhat by the natural disposition to shield herself from blame. She failed to tell of this occasion in which she now admits that she consented to the intercourse, but charged her trouble up to the act committed on the afternoon of the 14th, when she insists that she resisted his embraces. After reading in full the testimony which she gave before the jury and her testimony given at the bastardy proceeding, we still

believe the jury was warranted in finding the story told on this trial to be true.

It is rarely, if ever, possible to furnish direct corroboration of the principal fact; but, in this case, they were seen together late at night on the date she alleges the first act of intercourse occurred. That opportunity existed on the other dates she alleges is clearly evident from all the testimony. Before the expiration of a month her pregnancy was discovered by the doctor who examined her, and she is not shown to have been in company with any other man who might be the author of her trouble. Defendant admits that he had agreed to consider what he would do for her, and to meet her in North Platte. These facts, together with his own version of the conversations taking place in the office of the county attorney and on the streets of North Platte, are sufficient corroboration.

But defendant, in addition to denying that he ever had improper relations with the girl, argues that she was not previously unchaste, and that the verdict ought to be set aside for that, if for no other, reason. He testifies that on two separate occasions he saw her having intercourse with a man employed on the ranch, named Wesley Randall, and inferentially charges that another man, named Charlie Russell, employed on the ranch, had been found in her room, but states nothing definite as to Russell. The story he tells as to finding her and Randall together is entirely lacking in corroboration. He claims to have had this knowledge for nearly two years and never to have mentioned it to any person until he told it on the witness stand. He was not without the benefit of counsel, and must have known that, if true, this would be a defense. He made no effort to subpoena either Russell or Randall, but trusted to his own uncorroborated statement to blacken the reputation of the girl he was charged with having debauched.

In support of a motion for a new trial, defendant filed affidavits calculated to support his contention that prosecutrix was previously unchaste, but these affidavits are so vague and indefinite that if the statements therein con-

tained had been made to the jury it is not likely they would have been given any serious consideration.

Complaint is made because the court refused to give in- structions No. 1 and No. 3 requested by defendant. But the substance of these instructions is covered by the in- structions given by the court on its own motion, and these assignments are not well taken.

The verdict is fully sustained by the evidence. The record is free from error, and the judgment is

AFFIRMED.

SEDGWICK, J., dissents.

HAMER, J., concurring.

I have read all the evidence. The prosecutrix was a young girl at school. She was 9 or 10 years younger than the defendant. He was 26, and was in charge of the Han- sen ranch. The girl was staying at Hansen's and was working for her board while she went to school. Mr. and Mrs. Hansen were away a part of the time in California. The girl was at Hansen's three years. The defendant had been there and in charge of the ranch for five or six years. The prosecutrix was unable to adequately defend herself against the defendant.

On the night of April 10, 1914, the prosecutrix went to a party at Calhoun's, about two miles south of Hansen's. She went there on horseback. There may be some doubt about the defendant going there with her, but after reading the evidence the writer thinks not. They rode back on horseback, and were among the last to leave Calhoun's. The defendant denies that he was in the barn with the prosecutrix after their return from Calhoun's. The defend- ant at that time claimed that he had moved over to Beach's place. He seems to have taken charge of the Beach ranch. The defendant claimed at that time to have left the Hansen ranch permanently. He claimed that prior to April 1, or about that time, he had moved his colts and machinery from the Hansen ranch down to Beach's place. According to the testimony of the prosecutrix, the defendant seems

to have frequently gone back to the Hansen ranch. Her testimony concerning the fact that he still kept his clothes at the Hansen ranch seems to corroborate her other testimony as to the relations between them. During the three years that she was at Hansen's there was only a short period when she was gone, and the defendant testified that he could not remember when that was. He admits going to the party at Calhoun's with Miss Thiede, the prosecutrix, but says that she came by the Beach place on her way home from school and asked him to go with her. And he testified: "I didn't say a word. I turned around and walked away. I went to the house." He saw her again that same day. He testified she came to the Beach place where he was; that she was riding a gray saddle horse, which she put in his barn, and then came up to the house and waited for him until after he dressed for the party; but he told her that she could go if she wanted to. He seems to have testified to that as an excuse for going with her. He says that they were the last to leave Calhoun's the night of the party. He says he met her just outside the door, and that she came along with him, and that they passed Arthur Qualley. He denied going home with her. He testified that she branched off at the schoolhouse and cut across the meadows and went home, while he came straight north up the Tryon road to his place; and he denied going to Hansen's place that night. She appears to have daily passed him when he was at work on the Beach ranch. She was on her way to and from school, and he said, "I never paid any attention to it."

After she found out that she was pregnant she visited him in the cornfield, and asked him if he could not help her. He said: "Well, I will consider this proposition over." He then arranged to meet her at the courthouse. Would he have done this if he had not regarded himself as the father of the unborn child? This testimony corroborates the evidence of the prosecutrix. The defendant offered to settle up the case. That is a further corroboration of the testimony of the prosecutrix. He met the prose-

cutrix and her mother and sister. He was ready to fix the matter up. What he said would probably not have been said by an innocent man. He was ready to pay $200. He had it fixed to get the money, so he testified. This would seem to be a corroboration of the testimony of the prosecutrix and sufficient to establish the defendant's guilt.

When asked if he had not said that he was sorry the affair had arisen, he admitted he had. He talked with the prosecutrix and her mother and sister. He testified: I told them that I was sorry that this trouble had come between us." Is a man likely to get very sorry if the woman is just lying on him? He gets angry if the woman lies on him without any cause, and he gets sorry when she tells the truth and there is a serious difficulty to meet. He was sorry because of the condition of affairs and because of the baby to be. He was sorry he had gotten into trouble by being guilty. That was the kind of sorrow that had hold of him. When she visited him in the cornfield to tell of her condition he was in a great hurry and had no time to listen to her, but he did listen. When she stood down before him he said he could not wait. He testified: "I had my work to do." It was not his work that was bothering him, it was the trouble of this girl and their prospective baby. "Q. What did she talk about? A. Why, she just sat there and never said a word. Q. Did you say anything to her? A. No." The thing he was called on to meet was trouble. He knew what was the matter. That was what kept him silent for half an hour. Then he began to manufacture his defense, and to threaten her with Charles Russell, and perhaps Wesley Randall. When a man does an indefensible thing and there is a woman who is going to suffer because of his wrong, then he begins to abuse the woman and to fabricate and spread dirty slanders about her. To defend himself he testified to what he says he saw between the prosecutrix and Russell, and also Randall. According to his story no attention was paid to him, although he was close to the guilty pair and called out in a loud voice. A child or a foolish person could have invented a better story

than he did. Its untruthful character is at once apparent. When he had an interview with the prosecutrix and her mother and sister, he invented the story concerning Randall to justify himself in not marrying the prosecutrix. He testified that he told them, "It makes no difference now whether I have did this crime or not, but, I says, you have got me now into it and I am willing to come to any terms to blot this off of my name; my name has been blotted." They said, "We want you to marry Minnie." He testified that he said, "No. I think we ought to come to some other kind of agreement." Then he starts out with Minnie's alleged improper conduct with Randall as an excuse for not marrying her. The Randall story is as intangible as the Russell story, and both are unreasonable in the extreme. Randall had not been seen for a long time, not since he was going away. Besides, defendant did not report her misconduct to any one, although he was in charge of the ranch. Neither did he discharge Randall. When asked why he did not discharge him, he said because "he was a pretty good man." Of course Randall left, and the defendant does not know where he is. He never tried to get him as a witness, and never knew where he was.

At the Calhoun party the prosecutrix waited for the defendant, so he says, and they started home together. "It was awful cloudy and very dark," so he testified. He further testified that it probably was a gentleman's duty to go home with her, and then he thought, "I have got my work to do. I will go on home. It is late." Was it natural to do that on a night that was so awful cloudy and very dark, or to ride with her and then stop at Hansen's barn to help her put the horse away? The girl says he went all the way to Hansen's with her, and then that he stopped at the barn. The girl's story as to what happened is natural and reasonable, and it rings like the truth. The girl was at the barn, too. She told all about what happened in the barn. He let his horse run loose. Then he was insistent and had matters his own way.

Parmalee v. State.

Several affidavits were filed touching the alleged bad character of the prosecutrix. They were filed after the defendant had been tried and convicted. The persons signing these affidavits do not set forth a sufficient reason for not testifying. Diligence in preparing the case for trial is not shown. If these persons who make the affidavits were ready to testify to the things set up in them, then they should have been looked for and found and subpœnaed and brought in as witnesses to attend the trial and testify. The story they tell does not seem to have favorably impressed the judge before whom the case was tried. He refused to grant the new trial applied for. No error is shown in his refusal. He was closer than we are to the persons who attempted to swear away the good character of this young girl. In these affidavits, of course, there was no opportunity for cross-examination. The affidavits do not favorably impress the writer with their truthfulness, and no sufficient excuse is given for the failure to find these proposed witnesses before the trial. This young girl was struggling to maintain herself by the labor of her hands while she obtained an education. She was entitled to the sympathy and help of all who knew her. The defendant, who was much her senior, should have guarded and protected her, instead of plunging her into shame and disgrace. If men mislead and deceive women, and especially young girls, and break faith with them and make them drink the bitter dregs of disappointment, disgrace and dishonor, then there should be no hesitation upon the part of the courts to enforce the law and to punish those who break it.